# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

NATIONAL WILDLIFE FEDERATION )
11100 Wildlife Center Drive )
Reston, VA 20190, )
)
)
        and )

FLORIDA WILDLIFE FEDERATION          CASE NUMBER  1:05CV01671
2545 Blairstone Pines Drive          JUDGE: Colleen Kollar-Kotelly
Tallahassee, FL 32301
                                     DECK TYPE: Administrative Agency Review
        Plaintiffs,                  DATE STAMP: 08/22/2005

                                     )
v.                                   )
                                     )
FRANCIS J. HARVEY, in his official capacity  )    **COMPLAINT FOR**
Acting Secretary of the U.S. Department      )    **DECLARATORY AND**
of the Army                                  )    **INJUNCTIVE RELIEF**
101 Army Pentagon                            )
Washington, D.C. 20310,                      )
                                             )
        Defendant.                           )

1. The snail kite, a bird of prey based in Florida's Everglades ecosystem, is rapidly heading toward extinction due to the shortsighted and irresponsible decisions of the Defendant United States Corps of Engineers ("Corps"). In the four-year period from 1999 to 2003, the snail kite population has plummeted from 3577 to 1610 individuals. Much of this decline is due to the Corps' mismanagement of Lake Okeechobee and failure to consult with wildlife experts at the U.S. Fish and Wildlife Service ("FWS").

1

## BACKGROUND

2.  Defendant, in defiance of its responsibility under the Endangered Species Act to conserve the endangered snail kite, has failed to ensure that its regulation of Lake Okeechobee water levels will not destroy the snail kite's critical habitat or jeopardize the species' existence in the wild.  Since 1978, Defendant has implemented a water management schedule – a set of rules governing the timing, amount, and location of water releases – that degrades and destroys snail kite habitat and severely reduces its primary food source.

3.  The schedule adopted in 1978 has decreased natural water level fluctuations and increased Lake Okeechobee's overall water levels to the detriment of the snail kite.  Although the Corps amended the schedule in May 1992 ("Run 25") and again in November 1999 ("Water Supply and Environment" or "WSE"), it has never addressed this harm.  The Corps is now considering a third amendment, called the Class Limit Adjustment ("CLA"), and is again refusing to address the endangered bird's plight.

4.  Despite clear evidence of snail kite declines caused by its water management schedule over the past twenty-seven years, the Corps has not consulted with FWS over the schedule's overall impacts on the snail kite in Lake Okeechobee since 1978.

5.   As discussed in detail below, the Corps is violating the Endangered

Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), in the following respects:

(a)     The Corps is violating ESA § 7(a)(2) and 50 C.F.R. §402.16 by failing

to reinitiate formal consultation with FWS concerning the overall

impacts of its Lake Okeechobee water management schedule on the

snail kite and thus failing to ensure that this schedule will not

jeopardize the continued existence of the endangered snail kite or

adversely modify its critical habitat.  (Count 1 –Violation of ESA §

7(a)(2) and 50 C.F.R. §402.16).

(b)     The Corps is violating ESA §9 by implementing a Lake Okeechobee

water management schedule that takes snail kites.  (Count 2 –

Violation of ESA § 9).

(c)     The Corps is violating ESA § 7(a)(1) by failing to create a

conservation program for the snail kite. (Count 3 – Violation of ESA

§ 7(a)(1)).

## JURISDICTION AND VENUE

5.   This court has subject matter jurisdiction over the claims set forth in

this complaint under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201

(declaratory relief), and 16 U.S.C. § 1540(c) (actions arising under the ESA).

6.  On June 15, 2005, Plaintiffs gave written notice of ESA violations in compliance with the requirements of 16 U.S.C. § 1540(g)(2)(A)(i).

7.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

8.  Plaintiff National Wildlife Federation ("NWF") is the nation's largest non-profit conservation advocacy and education organization. NWF has more than one million members, and has affiliate organizations in 47 states and territories, including Florida. NWF's mission is to educate, inspire, and assist individuals and organizations of diverse cultures to conserve wildlife and other natural resources and to protect the earth's environment in order to achieve a peaceful, equitable, and sustainable future. Since 1936, NWF has been working to conserve threatened, endangered, and other imperiled species such as the endangered snail kite.

9.  Plaintiff Florida Wildlife Federation ("FWF") is a non-profit conservation education organization, incorporated in the state of Florida. FWF has over ten thousand members in Florida and is a state affiliate of NWF. One of FWF's primary purposes is to protect and conserve wildlife, particularly endangered species of Florida. FWF has also been actively involved in protecting fish and wildlife habitat in Lake Okeechobee.

4

10. Defendant Francis Harvey is the Acting Secretary of the U.S. Department of the Army.   Defendant Harvey is legally responsible for all decisions of the Corps, including those decisions implementing the ESA. Defendant Harvey is hereinafter referred to as the Corps.

## STANDING

11. Plaintiffs bring this action on behalf of their members, many of whom regularly enjoy and plan to continue enjoying educational, recreational, scientific, and aesthetic activities in and adjacent to snail kite habitat in Lake Okeechobee. Plaintiffs' members are thus harmed by the Corps' failure to reinitiate formal consultation with FWS, and its failure to ensure that the impact of its Lake Okeechobee water regulations on the snail kite will not jeopardize the continued existence of the snail kite or adversely modify its critical habitat.  Similarly, Plaintiffs are harmed (i) when the Corps takes (or harms) individual snail kites, and (ii) by the Corps' failure to develop a conservation program for this endangered bird.  The relief sought in this action, if awarded, will redress this harm by better protecting this highly endangered bird and its habitat.

## FACTUAL BASIS FOR PLAINTIFFS' CLAIMS

### A. Snail Kite Background

12. The endangered and majestic Everglade snail kite (*Rostrhamus sociabilis*) is a medium-sized hawk found primarily in tropical and subtropical

lowland freshwater marshes, from Florida, Cuba, and Mexico to Argentina and Peru. Multi-Species Recovery Plan for South Florida ("MSRP") at 4-291. Historically, in the United States, snail kites inhabited most of peninsular Florida. Today, however, the birds are restricted to the South Florida Ecosystem, including watersheds of the Everglades, marshes of Lake Okeechobee, Kissimmee River, and Upper St. Johns River.

13. The survival of the snail kite is linked to that of its primary prey, the apple snail. To hunt successfully, kites must have open freshwater marshes that support large populations of apple snails and are suitable for finding and capturing them as well as patches of trees on which they can perch and nest. These conditions are much affected by water level, which determines water and habitat quality. Thus, management of water levels in Lake Okeechobee is important to the snail kites' survival. The Lake Okeechobee marsh must both support apple snails and maintain emergent vegetation at a density that allows in-flight feeding.

14. The snail kite was first listed as endangered pursuant to the Endangered Species Conservation Act ("ESCA") of 1967. Its endangered status was then carried over when the Endangered Species Act was enacted in 1973. In 1977, FWS designated the 100,000-acre western marsh of Lake Okeechobee as critical habitat for the snail kite. 42 Fed. Reg. 40,686 (Aug. 11, 1977).

6

15. Generally, to protect critical habitat for the snail kite, water levels in Lake Okeechobee should be between 12.0 and 15.5 feet National Geodetic Vertical Datum, with these low and high water levels met every three years. Annually, water levels within Lake Okeechobee should be dropping from November through June, stable through August, and peaking in October. Lake Okeechobee and Associated Estuaries Issue Team, Florida Fish and Wildlife Conservation Commission, Management of Lake Okeechobee and Associated Estuaries (Nov. 2003).

### B. **The 1978 Schedule and Amendments to that Schedule**

*1. 1978 Schedule*

16. Water levels in Lake Okeechobee were operated on a 13.5 to 15.5 feet schedule until May 1978 at which time the Corps adopted the "1978 Schedule," which eliminated much of the natural water level fluctuation and increased water levels by an average of two feet to 15.5 – 17.5 ft. to provide more water for irrigation.

17. Before adopting the 1978 Schedule, the Corps formally consulted with FWS over the impacts of this Schedule on the endangered snail kite and its critical habitat.

18. As a result of this consultation, FWS issued a Biological Opinion ("BiOp"), which found that the implementation of the 1978 Schedule would not jeopardize the snail kite or adversely modify its critical habitat.

19. However, FWS stressed that these conclusions were based only on "presently available information provided during the consultation meeting of December 19, 1977," and that the Corps was not relieved "of the responsibility of reviewing the continuing activities under this action and other related programs in light of [its] Section 7 obligations." BiOp at 1 (Mar. 8, 1978). Because of the number of uncertainties, FWS recommended that the Corps implement an apple snail monitoring program, and stated that if monitoring revealed changes affecting the kite, then the Corps *must* reinitiate consultation. *Id.* The Corps, however, never instituted this monitoring program or reinitiated consultation.

2. *Amendment #1: Run 25*

20. In May 1992, the Corps implemented an interim 15.65- 16.75 foot schedule known as "Run 25." Because the Corps did not reinitiate consultation on the overall schedule for Lake Okeechobee, but rather consulted on Run 25 in isolation, the FWS concurred that Run 25 itself did not adversely affect the snail kite or its critical habitat.

### 3. *Amendment #2: Water Supply and Environment ("WSE")*

21. In November 1999, the Corps adopted a new interim schedule called Lake Okeechobee Regulation Schedule, Water Supply and Environment ("WSE"), which again modified the 1978 Schedule. Again, the Corps failed to reinitiate consultation on the overall schedule for Lake Okeechobee, but rather informally consulted on WSE in isolation. FWS concurred that the WSE alternative, when considered in isolation, was not likely to adversely affect the snail kite or its critical habitat.

### 4. *Amendment #3: Class Limit Adjustment ("CLA")*

22. The Corps is considering another minor modification to the current WSE, but has again failed to reinitiate consultation with FWS regarding the effects on the snail kite of the overall schedule for Lake Okeechobee. The modification, known as the Class Limit Adjustment ("CLA"), would give water managers the ability to make releases to the St. Lucie Canal and the Caloosahatchee River when such releases are not otherwise authorized by the WSE schedule.

23. Although FWS found that "CLA would slightly improve the flexibility of the water release schedule, which would in turn, slightly improve the ecological conditions within Lake Okeechobee's littoral zone *relative to the WSE Schedule,*" Letter from FWS to Corps (Jan 20, 2005) (emphasis added), the agency also recommended that the Corps immediately reinitiate consultation on the

effects of the *entire* schedule for Lake Okeechobee, not just the CLA modification

to WSE. *Id.*; Letter from FWS to FWF (Jan. 18, 2005).   To date, the Corps has

declined to follow this recommendation.

## C. **Plight of the Endangered Snail Kite**

24. The Corps' water management schedule causes persistently deep

water, wave action, and high phosphorus concentration in the Lake Okeechobee

marsh, seriously harming the snail kite and its critical habitat. *See* FWS, BO for

the Corps' IOP for Protection of the Cape Sable Seaside Sparrow (Mar. 28, 2002)

at 43.

25. Snail kite populations throughout Florida have plummeted in recent

years. Snail Kite Demography Annual Report (2003). In 1999, the kite

population was estimated at 3577 individuals, whereas just four years later, in

2003, the estimate had dropped to 1610. *Id.*

26. The situation in Lake Okeechobee is particularly dire. From the mid-

1980s to the mid-1990s, the lake was one of the most productive snail kite

breeding sites. Since then, however, lake stages have been either too high or too

low to sustain viable breeding habitat. *Id.* Snail kites have been nearly

eliminated from Okeechobee's marshes. Letter from Audubon to Corps (Oct. 28,

2004).

27. FWS biologists are highly concerned about the future of the snail kite in Lake Okeechobee. Letter from FWS to Corps (Jan. 20, 2005). "Declines in the overall population estimate for the snail kite and the lack of substantial numbers of snail kite nests in Lake Okeechobee in recent years have led to a general consensus among the experts that the species is faring poorly compared to its 1999 status." *Id.*

## STATUTORY FRAMEWORK

### <u>Endangered Species Act</u>

28. The Endangered Species Act ("ESA") is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon,* 515 U.S. 687, 698 (1995) (quoting *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978)). The Act assigns the lead role for administering the law to the Secretary of the Interior and the Secretary of Commerce. With respect to terrestrial species such as the snail kite, the duties of the Secretary of the Interior have been delegated to FWS. *See* 50 C.F.R. § 402.01(b).

29. The ESA protects plant and animal species that are listed as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6).

11

30. Once a species is listed, FWS must develop and implement a "recovery plan" for the "*conservation* and survival" of the species. *Id*. § 1533(f)(1) (emphasis added). Section 7(a)(1) of the ESA requires that other federal agencies must, in consultation with FWS, "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the *conservation* of endangered species and threatened species . . . ." *Id*. § 1536(a)(1) (emphasis added).

31. Section 7(a)(2) of the ESA requires that, "in consultation with and with the assistance of [FWS]," each federal agency shall "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence" of a listed species or "result in the destruction or adverse modification of" the species' critical habitat. 16. U.S.C. § 1536(a)(2). To ensure compliance, section 7(a)(2) also requires each federal agency proposing such action to consult with FWS regarding the impacts of this action on listed species and their critical habitats. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

32. A formal section 7(a)(2) consultation culminates in FWS's issuance of a biological opinion addressing, among other things, whether the activity is likely to jeopardize the continued existence of a listed species or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(3)(A). The regulations define "jeopardize the continued existence of [a species]" as "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of

both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. This determination is referred to as a "jeopardy" or "no-jeopardy" finding. The regulations define "adversely modify" as "direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." 50 C.F.R. § 402.02.

33. Because actions are often carried out over a period of years and circumstances may change during that time frame, an agency must reinitiate consultation "(b) [i]f new information reveals effects of the action that may affect listed species . . . in a manner or to an extent not previously considered; [or] (c) [i]f the identified action is subsequently modified in a manner that causes an effect to listed species . . . that was not considered in the [determination] . . . ." 50 C.F.R. § 402.16(b) and (c).

34. Section 9 of the ESA prohibits any person (including any federal agency) from "taking" an endangered species. 16 U.S.C. § 1538(a)(1)(B). "Take" is defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect or to attempt to engage in any such conduct." *Id.* § 1532(19). FWS defines "harm" to include significant modification or degradation of a species' habitat

13

that "actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding and sheltering."  50 C.F.R. § 17.3.  "Harass" includes "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  *Id.*

## COUNT ONE

### Violations of ESA § 7(a)(2), 50 C.F.R. § 402.16(b) and (c)

36. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

37. The Corps failed to reinitiate ESA consultation over its water management schedule for Lake Okeechobee when new information revealed that this schedule has harmed the snail kite in a manner and to an extent not considered in the 1978 BiOp or in any other subsequent analysis.  By continuing to implement its water management schedule for Lake Okeechobee without reinitiating ESA consultation concerning its overall effects on the snail kite and its critical habitat, the Corps has violated Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.16(b).

38. The Corps has failed to ensure that its water management schedule for Lake Okeechobee will not jeopardize the continued existence of the

14

endangered snail kite or adversely modify its critical habitat, thereby violating

Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2).

## COUNT TWO

### Violations of ESA § 9

39. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

40. The Corps is illegally taking the snail kite. The Corps' water management actions have harmed and harassed numerous individual snail kites and continue to harm and harass kites. By mismanaging the lake levels, the Corps has degraded the snail kite's habitat and has thereby significantly impaired essential behavior patterns, including breeding, feeding, and sheltering. If allowed to continue, these actions will likely continue to harm and harass the snail kite. The Corps is therefore in violation of Section 9 of the ESA, 16 U.S.C. §1583(a)(1)(B).

## COUNT THREE

### Violations of ESA § 7(a)(1)

41. Plaintiffs incorporate by reference each and every other allegation in this Complaint.

42. The Corps has failed to develop a program for the conservation of the snail kite or to consult with FWS regarding a proposed program. The Corps is

therefore in violation of ESA § 7(a)(1), 16 U.S.C. § 1536(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court grant the following relief:

A.   Declare that the Corps' water management schedule for Lake Okeechobee is invalid and in violation of ESA § 7(a)(2) and 50 C.F.R. §402.16 due to the Corps' failure to reinitiate consultation with FWS regarding the schedule's effects on the snail kite and its critical habitat and its failure to ensure that the schedule will not jeopardize the continued existence of the endangered snail kite or adversely modify its critical habitat

B.   Declare that the Corps is violating ESA § 9 by harming and harassing snail kites in implementing its water management schedule for Lake Okeechobee.

C.   Declare that the Corps is violating ESA § 7(a)(1) by failing to develop a program for the conservation of the snail kite or to consult with FWS regarding a proposed program.

D.   Remand the Corps' water management schedule for Lake Okeechobee to the Corps for ESA consultation with FWS regarding its impacts on the snail kite and its critical habitat.

E.   Pending completion of the ESA consultation, enjoin the Corps from managing Lake Okeechobee water in a manner that further destroys or degrades the snail kite's habitat.

F.   Award Plaintiffs their reasonable costs and attorney fees.

G.   Provide such further and additional relief as the Court deems just and proper.

Respectfully submitted,

Dated: August 22, 2005

John Kostyack, Esq.
D.C. Bar No. 415484
Telephone: (202) 797-6879

M. Randolph Sargent, Esq.
D.C. Bar No. 471907
Telephone: (202) 797-6865
National Wildlife Federation
1400 16th Street, N.W., Suite 501
Washington, D.C. 20036-2266
Fax: (202) 797-6646

Attorneys for Plaintiffs

17